UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| BARBARA J. BELL, | ) | No.  SA CV 08-262-PLA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

I.

**PROCEEDINGS**

Plaintiff filed this action on March 10, 2008, seeking review of the Commissioner's denial of her applications for Disability Insurance Benefits and Supplemental Security Income.  The parties filed Consents to proceed before the undersigned Magistrate Judge on March 31, 2008, and April 14, 2008.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on October 29, 2008, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on June 29, 1962. [Administrative Record ("AR") at 1065.]  She has a high school education and has completed one year of college. [AR at 121, 185.] Plaintiff has past relevant work experience as an installer, automotive instructor, and in aircraft repairs. [AR at 116-17.]

On February 24, 2005, plaintiff filed her applications for Disability Insurance Benefits and Supplemental Security Income payments, alleging that she has been unable to work since December 2, 2002, due to soft tissue injuries of the arm, depression, and anxiety. [AR at 115-22, 1065.]  After her applications were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 40, 44, 47-51, 55-61.]  A hearing was held on October 4, 2006, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 1063-91.]  A vocational expert and a medical expert also testified. [AR at 1076-77, 1080-84, 1090.]  On February 22, 2007, the ALJ determined that plaintiff was not disabled.  [AR at 11-23.]  Plaintiff requested review of the hearing decision.  [AR at 10.]  When the Appeals Council denied plaintiff's request for review on January 11, 2008, the ALJ's decision became the final decision of the Commissioner.  [AR at 3-6.]  This action followed.

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's

decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

1  sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled
2  and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform
3  past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie
4  case of disability is established.  The Commissioner then bears the burden of establishing that the
5  claimant is not disabled, because she can perform other substantial gainful work available in the
6  national economy.   The determination of this issue comprises the fifth and final step in the
7  sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d
8  at 1257.

9

10  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

11        In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial
12  gainful activity since the alleged onset date of the disability.[1]  [AR at 16.]  At step two, the ALJ
13  concluded that plaintiff has the following "severe" impairment: "a left shoulder dislocation with
14  status post multiple surgeries for instability which more than minimally restrict her ability to perform
15  work related activities."  [AR at 16.]  At step three, the ALJ determined that plaintiff's impairments
16  do not meet or equal any of the impairments in the Listing.  [AR at 17.]  The ALJ also found that
17  plaintiff retained the residual functional capacity ("RFC")[2] to "lift and carry 20 pounds occasionally
18  and 10 pounds frequently with the bilateral upper extremities, but is able to lift and carry only 5
19  pounds with the left upper extremity[;] sit for six hours out of an eight hour day[;] and stand/walk
20  for six hours out of an eight hour day with a change of position at normal workday breaks"; push
21  and pull with the right upper extremity, but not the left upper extremity; frequently climb stairs,
22  bend, balance, stoop, kneel or crouch, but never climb ladders/scaffolds or crawl; and frequently,
23  but not constantly, perform gross and fine manipulation with the left upper extremity.  [AR at 17.]
24  The ALJ further found that plaintiff is restricted from "reaching or lifting at or above shoulder level,"

25  _____

26  [1]    The ALJ also determined that plaintiff "meets the insured status requirements of the
     Social Security Act through December 31, 2007."  [AR at 16.]

27

28  [2]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.
     Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

and "performing forceful gripping or torquing" with the left upper extremity, and "working at unprotected heights, being around dangerous or fast moving machinery, and using vibratory tools." [AR at 17-18.]  At step four, the ALJ concluded that plaintiff was not capable of performing her past relevant work.  [AR at 22.]  At step five, the ALJ found, based on the vocational expert's testimony, that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform."  [AR at 22-23.]  Accordingly, the ALJ determined that plaintiff is not disabled.  [AR at 23.]


**V.**

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ: (1) erred in failing to consider plaintiff's depression and anxiety beyond step two of the five-step evaluation process; (2) erred in finding that plaintiff's shoulder impairment failed to meet or equal the criteria of the Listing at section 1.08; and (3) improperly restated and weighed the functionality opinions of treating orthopaedist Dr. George F. Hatch, III.  Joint Stipulation ("Joint Stip.") at 19.  As set forth below, the Court agrees with plaintiff, in part, and remands the matter for further proceedings.


**A.    MENTAL IMPAIRMENT**

Plaintiff argues that the ALJ erred in concluding that her depression "does not amount to even a legally severe impairment" at step two of the evaluation process.  Joint Stip. at 20-23. Specifically, plaintiff asserts that the evidence of her depression was "too significant to dismiss at that early stage of the analysis, and the ALJ's sole stated reason for declaring her depression non-severe was legally insufficient."  Joint Stip. at 21.  Defendant argues that plaintiff failed to establish medical severity as to her depression and anxiety, and that substantial evidence supports the ALJ's step two finding.  Joint Stip. at 25-26.

A "severe" impairment, or combination of impairments, is defined as one that significantly limits physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520, 416.920.  "The Supreme Court has recognized that including a severity inquiry at the second stage of the evaluation process permits the [Commissioner] to identify efficiently those claimants whose

1    impairments are so slight that they are unlikely to be found disabled even if the individual's age,

2    education, and experience are considered." Corrao v. Shalala, 20 F.3d 943, 949 (9th Cir. 1994)

3    (citing Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)).

4    However, an overly stringent application of the severity requirement would violate the statute by

5    denying benefits to claimants who meet the statutory definition of "disabled." Corrao, 20 F.3d at

6    949 (citing Bowen v. Yuckert, 482 U.S. at 156-58). Despite use of the term "severe," most

7    circuits, including the Ninth Circuit, have held that "the step-two inquiry is a de minimis screening

8    device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)

9    (citing Bowen v. Yuckert, 482 U.S. at 153-54); see Hawkins v. Chater, 113 F.3d 1162, 1169 (10th

10    Cir. 1997) ("A claimant's showing at level two that he or she has a severe impairment has been

11    described as 'de minimis'"); see also Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989)

12    (evaluation can stop at step two only when there is no more than minimal effect on ability to

13    work). An impairment or combination of impairments should be found to be "non-severe" only

14    when the evidence establishes merely a slight abnormality that has no more than a minimal effect

15    on an individual's physical or mental ability to do basic work activities. See Corrao, 20 F.3d at

16    949 (citing Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (citing Social Security Ruling[3] 85-

17    28)); see also Smolen, 80 F.3d at 1290 (citations omitted); 20 C.F.R. §§ 404.1521(a),

18    416.921(a). "Basic work activities" mean the abilities and aptitudes necessary to do most jobs,

19    including "physical functions . . . ," "[u]nderstanding, carrying out, and remembering simple

20    instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, co-workers and usual

21    work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. §§

22    404.1521(b)(3)-(6), 416.921(b)(3)-(6).

23       In the decision, the ALJ did not find that plaintiff had a severe mental impairment. [AR at

24    16.] The ALJ concluded that plaintiff was not under treatment for a mental disorder, and that

26        [3]   Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they

27    "constitute Social Security Administration interpretations of the statute it administers and of its own
regulations," and are given deference "unless they are plainly erroneous or inconsistent with the

28    Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

plaintiff "had also reported that symptoms of anxiety and depression were controlled with medications." [AR at 16.]

The ALJ's conclusion that plaintiff was not under treatment for a mental disorder is not wholly accurate. [AR at 16.] To the extent that the ALJ found plaintiff's mental impairments non-severe based on lack of treatment from a mental healthcare provider,[4] such a finding is insufficient under the specific circumstances of this case. [AR at 16.] An ALJ may "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). Some courts, however, have rejected the notion that a specialist's opinion should be given greater weight than a generalist who treated and examined the claimant in instances where the generalist practices in the area of specialty. In Sprague v. Bowen, the court found that a treating physician's opinion was medically acceptable notwithstanding his lack of specific expertise in psychiatry because "primary care physicians (those in family or general practice) 'identify and treat the majority of Americans' psychiatric disorders.'" 812 F.2d 1226, 1232 (9th Cir. 1987) (citation omitted). The Sprague court concluded that a duly licensed, primary care physician can practice and render psychiatric services and give a qualified opinion as to how the claimant's mental state impacted her physical disability. Id. (citations omitted). Similarly, in Lester, the court held that the ALJ could not disregard the treating physician's opinion regarding the claimant's mental functioning solely because the treating physician was not a mental health expert. 81 F.3d at 833. The Lester court found that the treating physician, who specialized in treating chronic pain, provided treatment for the claimant's psychiatric impairment and that his opinion constituted competent psychiatric evidence, notwithstanding the fact that he was not a board-certified psychiatrist. Id.

---

[4]    The record includes two reports of contact from a Social Security Administration analyst indicating that plaintiff had not received any mental health treatment, and that her prescriptions for psychotropic medications were from her primary care physician rather than from a psychiatrist. [AR at 94-95.]

1    Here, plaintiff was treated by a family practice physician, Dr. Dana Yan, for well over three

2    years.  [AR at 679-727, 731-68, 773.]  On February 22, 2005, Dr. Yan completed a Multiple

3    Impairment Questionnaire concerning plaintiff's impairments.  [AR at 706-13.]  Dr. Yan noted that

4    plaintiff's experience of pain, fatigue or other symptoms is severe enough to "constantly" interfere

5    with attention and concentration.  [AR at 711.]  She indicated that emotional factors, i.e.,

6    depression and anxiety, contribute to the severity of plaintiff's symptoms and functional limitations.

7    [AR at 711.]  Dr. Yan opined that plaintiff has anxiety and depression along with chronic pain, and

8    thus is capable of tolerating only "low stress" work as "stressful situations will aggravate her

9    symptoms."  [AR at 711.]  The treatment records from Family Care Centers, which contain Dr.

10    Yan's treatment notes, indicate that plaintiff was depressed and that plaintiff's medications

11    included Paxil and Xanax.  [AR at 679, 692, 697, 701, 717, 731-33, 738, 741, 744, 747, 750, 752,

12    754, 758, 766, 768, 911, 922, 924, 930, 933-34, 939.]  In a letter dated May 22, 2006, Dr. Yan

13    noted that plaintiff "is currently taking multiple combinations of pain medications, muscle relaxants,

14    anti-anxiety and antidepressant medications for her symptoms."  [AR at 954.]  Dr. Yan further

15    noted that the side effects of the medications "limit [plaintiff's] ability to concentrate, perform

16    mental tasks, perform gross and fine motor skills, and perform effectively at work."  [Id.]  Dr. Yan

17    opined that plaintiff "is disabled from her condition."  [AR at 954.]

18        Furthermore, the record includes treatment notes from other physicians that support Dr.

19    Yan's opinion, and thus undermine the ALJ's step two determination.[5]  On March 20, 2001, Dr.

20    Edward Etzkorn of Family Care Centers assessed plaintiff with severe depression, increased the

21    strength of her Paxil prescription, and refilled her prescription for Xanax.  [AR at 820.]  Plaintiff was

22    referred to clinician Richard Sullivan for treatment on April 2, 2001.  [AR at 898.]  Mr. Sullivan

23    completed a Health Care Coordination Form, in which he noted that plaintiff was diagnosed with

24    _____

25    [5]   It is noted that the record also contains letters written by plaintiff to her physicians
reflecting symptoms that may be associated with depression and anxiety.  For instance, on July

26    16, 2001, plaintiff stated: "I am so tired of living in pain every day," and on July 19, 2001, plaintiff
stated the following: "I have decided to stop taking all of my medications"; "I am tired of fighting

27    to be healthy, I am tired of the pain[,] and I am tired of the meds"; "I am also going to drop my
medical insurance and leave my life in the hands of God"; and "If I am lucky it will hit me so hard

28    and so fast that I will not even know it."  [AR at 895, 897.]

1   major depressive disorder, recurrent.[6]  Mr. Sullivan also noted plaintiff's medications as Paxil and

2   Xanax,[7] and indicated that those medications were being managed by a mental health professional.

3   [AR at 898.]  Mr. Sullivan further noted that outpatient care is being delivered and that the treatment

4   plan consists of individual psychotherapy.  [Id.]  Also, on several occasions in 2006, plaintiff was

5   noted as having a depressed mood, and assessed with depression.  [AR at 996-99.]

6           In addition, the complete psychiatric evaluation of plaintiff performed by Dr. Suzanne Dupee

7   on September 20, 2003, in conjunction with plaintiff's previous application for disability benefits,

8   supports Dr. Yan's opinion, and also undermines the ALJ's conclusion that plaintiff's mental

9   impairments are non-severe.  [AR at 16, 401-06.]  "[E]ven if a doctor's medical observations

10  regarding a claimant's allegations of disability date from earlier, previously adjudicated periods,

11  the doctor's observations are nevertheless relevant to the claimant's medical history and should

12  be considered by the ALJ."  See McLeroy v. Barnhart, 2006 WL 4046154, *6 (D. Kan. Oct. 31,

13  2006); see also Groves v. Apfel, 148 F.3d 809, 810-11 (7th Cir. 1998) (evidence submitted in

14  earlier application for benefits is relevant to subsequent disability application when determining

15  whether claimant is disabled by a progressive condition).  In the evaluation, Dr. Dupee noted that

16  plaintiff "is currently being treated with 60 mg of Paxil and Xanax [as needed] . . . ."  [AR at 402.]

17  She further noted that plaintiff has thought about suicide "when the pain gets bad."  [AR at 402.]

18  During the mental status examination of plaintiff, Dr. Dupee found that plaintiff had an "exhausted"

19  mood, "tearful" affect, "passive suicidal thoughts when the pain is severe," and difficulties with

20  concentration.  [AR at 403-04.]  She indicated that plaintiff's "mental problems are only secondary

21  to her physical limitations."  [AR at 405.]  Dr. Dupee opined that plaintiff "did have some problems

22  with her concentration due to her pain but hopefully, with adequate treatment and recovery from

23  _____

24      [6]   Plaintiff was assessed with DSM-IV diagnosis code "296.3," which is the diagnosis
    code for major depressive disorder, recurrent episodes.  [AR at 898.]  See American Psychiatric

25  Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") at 376 (4th Ed.
    2000).

26
        [7]   Paxil is used to treat, among other things, depression, panic attacks, and anxiety

27  disorders.  Xanax is used to treat anxiety and panic disorders. http://my.webmd.com/drugs/index-
    drugs.aspx (search "Find A Drug," by "Drug Name"; then enter the name of the drug; then select the

28  appropriate hyperlink if there are multiple forms of the drug; then follow "Uses" tab).

1   her shoulder surgery, her physical symptoms will improve and therefore, her depression should

2   be resolved."  [AR at 405.]  She found that plaintiff was moderately impaired in the ability to

3   maintain concentration, attention, persistence and pace.  [AR at 405.]  Dr. Dupee diagnosed

4   plaintiff with "adjustment disorder with depressed mood" and assessed plaintiff with a Global

5   Assessment of Functioning ("GAF") score of 55-60.[8]

6           The ALJ failed to mention all of the relevant evidence in assessing the severity of plaintiff's

7   mental impairments, specifically, the findings of depression and anxiety,[9] the limitation on plaintiff's

8   ability to maintain concentration and attention, and the GAF assessment of 55-60,[10] and did not

9   offer any sufficient reasons for the disregard of such evidence.  See Gallant v. Heckler, 753 F.2d

10  1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore competent evidence in the record in order

11  to justify her conclusion).  Thus, the ALJ erred in concluding, without properly addressing

12  "competent evidence" in the record, that plaintiff was not under treatment for a mental disorder.

13

14  _____

15      [8]    A Global Assessment of Functioning score is the clinician's judgment of the individual's
16  overall level of functioning.  It is rated with respect only to psychological, social, and occupational
    functioning, without regard to impairments in functioning due to physical or environmental
17  limitations.  See DSM-IV at 32.  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat
    affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
18  occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV
    at 34.

19

20      [9]    Although the ALJ in the decision concluded that plaintiff "reported that symptoms of
    anxiety and depression were controlled with medications," as discussed below, such a conclusion
21  is not supported by the record.  [AR at 28.]  See discussion, infra.

22      [10]   While a GAF score may not have a "direct correlation" to the Social Security severity
    requirements (see Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain
23  Injury, 65 Fed.Reg. § 50746-01 (Aug. 21, 2000)), the ALJ does not proffer any authority
    indicating that Dr. Dupee's assessment of a GAF score of 55-60 and its implications may be
24  ignored without sufficient reason.  See Olds v. Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5,
    2008) (a low GAF score does not alone determine disability, but it is a piece of evidence to be
25  considered with the rest of the record) (citation omitted); see also Sorenson v. Astrue, 2008 WL
    1914746, at *18 (N.D. Iowa Apr. 28, 2008) (a GAF score is used by medical professionals "'to
26  consider psychological, social, and occupational functioning on a hypothetical continuum of
    mental health-illness'") (citations omitted); Escardille v. Barnhart, 2003 WL 21499999, at *5-6
27  (E.D. Pa. June 24, 2003) (ALJ's failure to address a GAF score of 50 "or its meaning regarding
    plaintiff's ability to maintain employment" was error).
28

Moreover, the ALJ's finding that plaintiff had "reported that symptoms of anxiety and depression were controlled with medications" is not reflective of the record as a whole. [AR at 16.] Although the ALJ may consider whether plaintiff's impairments are controlled with medications in determining the severity of her impairments,[11] the ALJ may not consider only those portions of the record that favor her ultimate conclusion. See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence"); see also Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (while the ALJ is not obligated to "reconcile explicitly every conflicting shred of medical testimony," she cannot simply selectively choose evidence in the record that supports her conclusions); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted). Here, in support of her conclusion, the ALJ cited only the treatment records from Centinela Hospital Medical Center. [AR at 16, 407-19.] In the Internal Medicine Consultation/Preoperative Clearance report dated July 22, 2003, included in the treatment records cited by the ALJ, Dr. William G. Lang noted that plaintiff "reports anxiety and depression as a consequence of her chronic pain which has been controlled with medications . . . ," and assessed plaintiff with "[a]nxiety/depression, controlled with medications." [AR at 409, 412.] The ALJ improperly isolated Dr. Lang's findings in the preoperative evaluation in determining that plaintiff did not suffer from a severe mental impairment.[12] Dr. Lang did not treat plaintiff for depression or anxiety; he merely performed a

---

[11] "Impairments that can be controlled effectively with medication are not disabling . . . ." See Warre v. Commissioner of Social Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); see also Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("'[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling.'") (citations and internal quotations omitted).

[12] Defendant's contention that "[g]iven the dearth of evidence of any mental health treatment, it was appropriate for the ALJ to rely on Dr. Lang's notation which was based on [p]laintiff's own statement," is not well-supported. Joint Stip. at 25. As discussed above, the mere fact that plaintiff received treatment for her mental problems from her primary care physician rather than a psychiatrist or psychologist does not provide a sufficient basis on which to find a mental impairment non-severe. See Sprague, 812 F.2d at 1232 (a primary care physician is qualified to give a medical opinion as to a claimant's mental state as it relates to her physical disability even though a primary care physician is not a psychiatrist).

preoperative examination of plaintiff in connection with surgery that was unrelated to any mental health issues. A review of the record as a whole does not corroborate the single statement by plaintiff during the preoperative examination that her psychiatric problems were controlled with medications, or Dr. Lang's subsequent assessment based on that statement. Indeed, at the hearing on October 4, 2006, plaintiff testified that her family thinks she has mental problems. [AR at 1069.] She also testified that while she is not currently seeing a psychiatrist or psychologist, her primary care physician has requested that she do so because on occasion she has been so depressed that she has mentioned committing suicide. [Id.] She further testified that she was taking 60 milligrams of Paxil a day and one milligram of Xanax as needed, which were prescribed by her primary care physician. [AR at 1069.] Additionally, Dr. Yan, who treated plaintiff for an extended period, found her disabled despite the fact that plaintiff was taking antidepressants and anti-anxiety medications, as well as pain medications. [AR at 954.] See Smolen 80 F.3d at 1285 (9th Cir. 1996) (the opinions of treating physicians are generally given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant). Further, Dr. Dupee performed a mental status examination of plaintiff in which she found that plaintiff is moderately impaired in the ability to maintain concentration, attention, persistence, and pace, and noted that plaintiff has thoughts of suicide "when the pain gets bad" despite being treated with Paxil and Xanax. [AR at 402, 405.] See 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight it will be given). Plaintiff's testimony and the opinions of Dr. Yan and Dr. Dupee undermine the ALJ's finding that plaintiff's depression and anxiety were controlled with medications.

The ALJ's conclusion that plaintiff did not suffer from a severe mental impairment is not supported by substantial evidence. The record as a whole suggests that plaintiff meets the de minimis test at step two of the sequential analysis. Accordingly, remand is warranted on this issue.

/

/

1    **B.    TREATING ORTHOPAEDIST'S OPINION**

2         Plaintiff contends that the ALJ improperly considered the opinion of plaintiff's treating

3    orthopaedist, Dr. Hatch.  Joint Stip. at 32-34.

4         In the decision, the ALJ indicated that Dr. Hatch had given a blanket, conclusory statement

5    of disability without identifying any specific functional limitations.  [AR at 21.]  Nevertheless, the ALJ

6    noted that Dr. Hatch submitted a functional assessment that in "many aspects comports with the

7    opinion given by the medical expert, Dr. [Joseph] Jensen."  [AR at 21.]  Specifically, Dr. Hatch, like

8    Dr. Jensen,[13] found that plaintiff could lift up to 10 pounds and carry up to 5 pounds on an

9    occasional basis, and that she is essentially precluded from grasping, turning and twisting objects

10   or using her arms for reaching with the left upper extremity, but she is only minimally limited in the

11   left upper extremity in using her fingers/hands for fine manipulations.  [Id.]

12        Dr. Hatch treated plaintiff for well over a year.  [AR at 606-74, 990-95.]  He performed an

13   initial orthopaedic consultation of plaintiff on March 29, 2005, which revealed, among other things,

14   tenderness to palpation and deceased motor strength.  [AR at 629.]  During his treatment of plaintiff,

15   Dr. Hatch assessed plaintiff with left shoulder instability and capsular insufficiency.  [AR at 625, 632.]

16   On June 1, 2005, Dr. Hatch performed surgery on plaintiff's left shoulder.  [AR at 661-71.]  Although

17   Dr. Hatch initially noted that plaintiff was doing well following her surgery [AR at 621-22, 630], he

18   subsequently noted that plaintiff had increased anterior shoulder pain.  [AR at 612, 617-19.]  After

19   a review of the MR anthrogram of plaintiff's left shoulder performed on January 10, 2006, Dr. Hatch

20   opined that plaintiff's pain and "flipping" sensation in her shoulder were likely due to the instability

21   of her biceps tendons.  [AR at 637-38, 957-58.]  Based on his examination of plaintiff and review of

22   the MR anthrogram, Dr. Hatch recommended another left shoulder surgery.  [AR at 958.]

23        In an undated Bilateral Manual Dexterity Impairment Questionnaire, Dr. Hatch noted that

24   plaintiff had reduced grip strength, tenderness, and loss of fine coordination of the left hand.  [AR

25   at 990.]  He further noted that plaintiff's primary symptoms include pain, instability, and weakness.

26   _____

27        [13]   Dr. Jensen found that plaintiff could not lift or carry over 5 pounds with the left upper
     extremity at any time, use forceful gripping or torquing, or reach at or above shoulder level at any
28   time.  [AR at 1081-82.]

1    [AR at 991.]  Dr. Hatch found that plaintiff could lift 0-5 pounds on a frequent basis and 5-10 pounds

2    on an occasional basis, but could only carry 0-5 pounds on an occasional basis.[14]  [AR at 992.]  Dr.

3    Hatch further found that plaintiff is markedly limited (essentially precluded) in the left upper extremity

4    in her ability to grasp, turn, and twists objects, and in using her arms for reaching.  [AR at 994.]  In

5    a Supplemental Report dated October 12, 2006, Dr. Hatch noted that plaintiff "has a diagnosis of

6    instability with complete loss of her anterior capsule of her left shoulder, leading to gross instability."

7    [AR at 1038.]  He found that plaintiff's "condition meets the criteria of listing 1.08 with significant soft

8    tissue injury of the left upper extremity."  [AR at 1038.]  Dr. Hatch opined that plaintiff "will not be

9    able to regain major function in her left upper extremity, even after surgical stabilization has been

10   performed."  [AR at 1038.]  He further opined that plaintiff "will be unable to perform fine and gross

11   movements with the left upper extremity secondary to this disability."  [AR at 1038.]

12        The ALJ's conclusion that Dr. Hatch gave a blanket, conclusory statement of disability

13   without identifying any specific functional limitations is not supported by the record.[15]  [AR at 21.]

14

---

15

16    [14]  Dr. Hatch also completed a  Bilateral Manual Dexterity Impairment Questionnaire on
September 25, 2006, in which he found that plaintiff could never lift and/or carry any weight in a

17   regular work environment on a sustained basis.  [AR at 982-87.]  However, Dr. Hatch noted that
further work restrictions would be assessed as of November 30, 2006.  [AR at 987.]

18

19    [15]  Insofar as the ALJ believed that Dr. Hatch's opinion was internally inconsistent or
inadequate, the ALJ had a duty to further develop the record.  See Tonapetyan v. Halter, 242 F.3d

20   1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is
inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an

21   appropriate inquiry.'") (quoting Smolen, 80 F.3d at 1288).  If evidence from the medical source is
inadequate to determine if the claimant is disabled, an ALJ is required to recontact the medical

22   source to determine if additional needed information is readily available.  See  20 C.F.R. §§
404.1512(e)(1), 416.912(e)(1) ("We will seek additional evidence or clarification from your medical

23   source when the report from your medical source contains a conflict or ambiguity that must be
resolved, the report does not contain all the necessary information, or does not appear to be

24   based on medically acceptable clinical and laboratory diagnostic techniques.").  As a general rule,
the record will be considered "inadequate" or "ambiguous" when a medical source has provided

25   a medical opinion that is not supported by the evidence.  See Bayliss v. Barnhart, 427 F.3d 1211,
1217 (9th Cir. 2005).  The ALJ should recontact Dr. Hatch on remand in order to resolve any

26   perceived inconsistencies and inadequacies and fully develop the record.  See 20 C.F.R. §§
404.1519a(b)(4), 416.919a(b)(4) (where the medical evidence contains "[a] conflict, inconsistency,

27   ambiguity, or insufficiency," the ALJ should resolve the inconsistency by recontacting the medical

28   source).

1  Although an ALJ may reject a treating physician's opinion that is conclusory and unsupported by
2  clinical findings (see Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (treating physician's
3  opinion may be rejected if it is brief, conclusory, and inadequately supported by clinical findings)),
4  such is not the case here.  As detailed above, Dr. Hatch treated plaintiff on numerous occasions
5  over an extended period, and assessed plaintiff's functional limitations.  [AR at 606-74, 990-95,
6  1038.]  See 20 C.F.R. §§ 404.1527(d)(2)(i), (ii), 416.927(d)(2)(i), (ii) (weight accorded to a treating
7  physician's opinion dependent on length of the treatment relationship, frequency of visits, and
8  nature and extent of treatment received).  Based on the length of the treatment and Dr. Hatch's
9  experience with plaintiff, Dr. Hatch had the broadest range of knowledge regarding plaintiff's
10  medical condition, which is supported by the record.  See Smolen, 80 F.3d at 1279; see also 20
11  C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (treating physicians "are likely to be the medical
12  professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical
13  impairment(s) . . . ."); Lester, 81 F.3d at 833 ("The treating physician's continuing relationship with
14  the claimant makes him especially qualified . . . to form an overall conclusion as to functional
15  capacities and limitations, as well as prescribe or approve the overall course of treatment.").
16  Given that Dr. Hatch assessed plaintiff's functional limitations based on his extensive treatment
17  of plaintiff, including physical examinations, review of imaging studies, and surgery, the ALJ's
18  rejection of Dr. Hatch's opinion as conclusory itself lacks substantiation.

19      Moreover, the ALJ's selective reliance on particular findings of Dr. Hatch to support his non-
20  disability determination was error.  As discussed above, the ALJ may not point to and discuss only
21  those portions of the treatment record that favor her ultimate conclusion.  See Day, 522 F.2d at
22  1156 (an ALJ must look at the record as a whole and not merely at the findings that support a
23  nondisability determination).  Here, the ALJ bolstered her reliance on Dr. Jensen's opinion by
24  concluding that the majority of the findings in Dr. Hatch's functional assessment were similar to Dr.
25  Jensen's findings. [AR at 21.] While the ALJ was correct regarding certain similarities between the
26  two opinions, the ALJ did not discuss the portions of Dr. Hatch's opinion that differed from Dr.
27  /
28  /

1 /

2 Jensen's opinion, nor offer legally sufficient reasons to discount any portion of Dr. Hatch's opinion.[16]

3 Specifically, the ALJ failed to discuss or reject Dr. Hatch's opinion that plaintiff is unable to perform

4 fine and gross movements with the left upper extremity, as well as Dr. Hatch's conclusion that

5 plaintiff's condition meets the criteria of the Listing at section 1.08 with significant soft tissue injury

6 of the left upper extremity. [AR at 1038.] Contrary to Dr. Hatch's findings, Dr. Jensen found plaintiff

7 "would be capable on a frequent basis of doing light, gross, and fine manipulation," and opined that

8 plaintiff does not meet or equal the criteria of the Listing at section 1.08. [AR at 1081-84.] Thus,

9 the ALJ erred by failing to properly consider the opinion of Dr. Hatch as a whole, and did not

10 provide a sufficient explanation for her failure to do so.  As such, remand is warranted on this

11 issue.[17]

12 /

13 /

14 /

15 /

16 /

17 /

18 /

19 /

20 /

21

22    [16]   Where the treating physician's opinion is contradicted by another physician, the ALJ

23 may only reject the opinion of the treating physician if the ALJ provides specific and legitimate

24 reasons for doing so that are based on substantial evidence in the record.  See Lester, 81 F.3d at 830; see also 20 C.F.R. §§ 404.1527(d), 416.927(d) (requiring that Social Security

25 Administration "always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion").

26    [17]   As the ALJ's consideration on remand of Dr. Hatch's opinion may impact on the

27 remaining issue raised by plaintiff in the Joint Stipulation, the Court will exercise its discretion not to address that issue in this Order.  Rather, in light of the remand Order, plaintiff's shoulder

28 impairment should be re-examined at step three of the evaluation process.

/

**VI.**

**REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate to properly consider: (1) the severity of plaintiff's mental impairments at step two of the sequential analysis; and (2) the opinion of Dr. Hatch. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included or submitted to any online service such as Westlaw or Lexis.**

DATED: May 5, 2009

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE